UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| David A. McCoy II, Jeffrey M. Johnson, Sr., | Case No. 25-cv-00054 (JRT/DTS) |
| Plaintiffs, | |
| vs. | **COMMISSIONER JACOBSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** |
| Bob Jacobson, in his official capacity as the Commissioner of the Minnesota Department of Public Safety, | |
| Defendant. | |

Defendant Bob Jacobson, in his official capacity as Commissioner of the Minnesota Department of Public Safety, respectfully moves for dismissal of Plaintiffs' complaint in full and with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## FACTUAL BACKGROUND

Defendant Bob Jacobson bases the following recitation of facts on Plaintiffs' complaint but reserves the right to deny any and all of these allegations and to plead all applicable defenses should any claim survive this motion.

Plaintiffs are David McCoy II and Jeffrey Johnson, Sr. (ECF 1 ¶¶ 8-9.) McCoy is a resident of Texas, and Johnson is a resident of Georgia. (*Id.*) Defendant is Bob Jacobson, in his official capacity as Commissioner of the Minnesota Department of Public Safety (DPS). (*Id.* ¶ 10.) In his role at DPS and as relevant here, Commissioner Jacobson is responsible for annually establishing and publishing a list of other states that have laws governing the issuance of gun permits that are not similar to Minnesota's gun-permitting law. (*Id.*); *see also* Minn. Stat. § 624.714, subd. 16(a). When necessary, the Commissioner

executes reciprocity agreements regarding gun permits with jurisdictions whose gun-permitting laws are similar to Minnesota's. *See* Minn. Stat. § 624.714, subd. 16(d). Minnesota regulates firearms by, in part, requiring anyone who wants to carry a firearm to possess a permit. *Id.* subd. 1(a); *see also id.* subd. 9(5) (requiring permit to carry a firearm in one's vehicle unless the firearm is unloaded and secured).

Two manners of permitting are permissible in Minnesota. The first is to obtain a permit from Minnesota pursuant to the process set forth in Section 624.714. *Id.* subd. 2. This law utilizes a set of objective criteria that, when met, entitle an applicant to a permit. *Id.* subds. 2 (listing criteria), 6 (requiring issuance of permit unless criteria are not met). Alternatively, Minnesota law allows individuals to utilize permit reciprocity, which recognizes the permits issued by various other states (Reciprocity Provision). *Id.* subd. 16. Under this provision, permits from other states are presumptively valid in Minnesota unless another state's gun-permitting laws are "not similar" to Section 624.714. *Id.*

Plaintiffs challenge the Reciprocity Provision as unconstitutional under the Second Amendment. (ECF 1 ¶ 5.) McCoy has a valid gun permit from Texas, (*id.* ¶¶ 26, 64), and Johnson has valid gun permits from Florida and Georgia, (*id.* ¶¶ 43-45, 65). Currently, Minnesota does not recognize gun permits from Texas, Florida, or Georgia under the Reciprocity Provision. (*Id.* ¶¶ 24, 30, 40, 51, 53, 61, 64.)

Both McCoy and Johnson work full-time as long-haul truck drivers. (*Id.* ¶¶ 25, 42.) This work requires them to "travel[] on the road" throughout the continental United States at least 300 days each year. (*Id.*) Each year, Plaintiffs' driving assignments route them to and through Minnesota on "several" occasions. (*Id.* ¶¶ 25, 33, 42, 54, 65.) However,

Plaintiffs' assigned driving schedules change "from day to day," and Plaintiffs "never know[]" when their schedules will take them through Minnesota. (*Id.* ¶¶ 37, 58.)

Plaintiffs wish to carry loaded and uncased guns with them when they drive through Minnesota. (*Id.* ¶¶ 31, 52.) Because the permits they have from Texas, Florida, and Georgia are not currently on Minnesota's reciprocity list, Plaintiffs allege they must obtain a permit from Minnesota in order to carry loaded and unsecured firearms when in Minnesota. (*Id.* ¶¶ 40, 61.) Plaintiffs only challenge the Reciprocity Provision and do not advance a constitutional challenge as to the objective requirements for obtaining a Minnesota-issued gun permit, Minn. Stat. § 624.714, subd. 2. (ECF 1 ¶¶ 5, 88.) Nevertheless, they allege these requirements would be burdensome should Plaintiffs attempt to apply for a Minnesota permit. (*Id.* ¶¶ 67-72.)

## LEGAL STANDARD

The Court must grant a motion to dismiss for failure to state a claim when the complaint does not allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (construing Fed. R. Civ. P. 12(b)(6)). When reviewing such motions, the Court must accept as true all factual allegations and view them in the light most favorable to the plaintiff. *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 740 (8th Cir. 2002). The Court need not accept as true, however, conclusory allegations or legal conclusions drawn by the pleader from the facts alleged. *See Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999). In addition, Rule 12(b)(6) permits a court to dismiss a claim on the basis of dispositive issues of law. *Nietzke v. Williams*, 490 U.S. 319, 326 (1989).

**ARGUMENT**

The United States Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), resolved the constitutionality of shall-issue permitting regimes for guns. *Bruen* sets forth a two-step test for Second Amendment challenges, consisting first of "text, then history." *Worth v. Jacobson*, 108 F.4th 677, 687-88 (8th Cir. 2024), *petition for cert. filed*, No. 24-782 (U.S. Jan. 17, 2025). First, courts must assess whether "a focused application of the normal and ordinary meaning of the Second Amendment's language covers an individual's conduct." *Id.* at 688 (internal quotation marks omitted) (quoting *Bruen*, 597 U.S. at 17, 19-20). Second, if the first step is met, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* (quoting *Bruen*, 597 U.S. at 17, 19-20).

Under the guise of reciprocity, Plaintiffs challenge Minnesota's permitting regime as unconstitutional, even though it is a textbook example of a constitutionally-permissible shall-issue regime. *Bruen* gives this Court everything it needs to dispose of Plaintiffs' unfounded challenge. And if *Bruen* were not enough, Plaintiffs' claims suffer from at least two threshold legal defects that demand dismissal. For all of these reasons, the Court must dismiss Plaintiffs' claim in full and with prejudice.

**I.    PLAINTIFFS' CLAIM FAILS ON THRESHOLD ISSUES OF STANDING AND SCOPE.**

The Court need not reach the merits of Plaintiffs' claim because two independently-sufficient defects bar their claim at the threshold. First, Plaintiffs lack standing to advance their claim. And second, Plaintiffs' overly-ambitious decision to style their claim as a facial

challenge rather than an as-applied one imposes a high burden that Plaintiffs simply cannot meet. Dismissal is, therefore, proper.

### A. Plaintiffs Lack Standing.

There is no principle "more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

To demonstrate Article III standing, Plaintiffs bear the burden of showing three elements: injury in fact, traceability, and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Beginning with the first of these elements, an injury sufficient to confer standing must be "concrete," that is, "real, and not abstract." *TransUnion*, 594 U.S. at 424. The injury pleaded also must be "actual or imminent, not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560-61). And because the burden of establishing standing tracks the procedural stages of litigation, Plaintiffs' complaint must plausibly allege a sufficiently-imminent and non-hypothetical injury to survive this motion to

5

dismiss. *See L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 892 (8th Cir. 2024) (quoting *Missouri v. Yellen*, 39 F.4th 1063, 1067 (8th Cir. 2022)).

Here, Plaintiffs falter on this first element of standing as they have not plausibly pleaded injury. Neither McCoy nor Johnson are residents of Minnesota. (ECF 1 ¶¶ 8-9.) Both Plaintiffs work as long-haul truck drivers and, attempting to justify their extraterritorial attack on Minnesota's laws, manufacture a connection to Minnesota by alleging they "travel[] through Minnesota several times a year." (*Id.* 33, 54.) These allegations lack any meaningful details, such as the length of Plaintiffs' careers as long-haul truck drivers, the number of trips they have driven to and/or through Minnesota, or the amount of time they typically spend on driving assignments that take them through Minnesota. (*See generally* ECF 1.) Indeed, both plaintiffs admit they "never know[] when [their] schedule[]s will take [them] to or through Minnesota." (*Id.* ¶¶ 37, 58.) And neither Plaintiff has alleged *any* upcoming assignment, plan, or intention to return to Minnesota, for work or any other reason. (*See generally* ECF 1.) For all Plaintiffs know, they might never be assigned to drive through Minnesota again, stripping them of any quarrel they might have with its laws.

On this point, the Supreme Court's decision in *Lujan* is instructive. In that case, two wildlife-enthusiast plaintiffs sought to enjoin the Secretary of the Interior from interpreting the Endangered Species Act in a manner they believed would imperil animals abroad, in places like Egypt and Sri Lanka where the plaintiffs hoped to visit and view these animals. *Lujan*, 504 U.S. at 558-59. The plaintiffs asserted that they had traveled to these locations in prior years to view wildlife, and had plans to return "in the future." *Id.* at 563. The Court

rejected their claims for lack of standing, concluding their prior time abroad "proves nothing" and their professed intent to return was "simply not enough." *Id.* at 564.

So too, here. Plaintiffs McCoy and Johnson offer nothing more than "some day" intentions about returning to Minnesota—without any description of "concrete plans," assigned work routes that will take them through Minnesota, or "any specification of *when* the some day" of such assignments might be. *Id.* (emphasis original). Indeed, Plaintiffs have not identified *any* plans to return to Minnesota of their own volition, nor any work assignments that might require them to do so in the future. (ECF 1 ¶¶ 37, 58.) Their allegations are exactly the sort of speculative, conjectural, and inchoate claims that *Lujan* forbids. Certainly, on these allegations it is not plausible that Plaintiffs will soon and surely encounter any constitutionally-meaningful controversy with Minnesota's laws. *All. for Hippocratic Med.*, 602 U.S. at 381. Plaintiffs thus cannot establish an Article III injury and, therefore, also cannot meet the required elements of causation or redressability.[1] This lack of standing bars Plaintiffs' claim and requires dismissal in full.

B. **Plaintiffs Cannot Win on Their Facial Challenge.**

The Complaint advances a facial challenge. (*E.g.*, ECF 1 ¶ 74 (referencing "millions of other similarly situated Americans").) Plaintiffs chose to make their claim a facial one,

---

[1] Besides the relationship between injury and the other required elements of standing, Plaintiffs also fail to meet those additional elements of standing—causation and redressability—for other, independent reasons. For example, Plaintiffs' inability to carry a firearm pursuant to the Reciprocity Provision is arguably caused by their lack of (or unwillingness to obtain) a permit from one of the twenty states that do qualify for reciprocity, some of which might have gun-permitting regimes that are less burdensome for Plaintiffs than Minnesota's.

7

"and that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Here, that cost is the viability of their claim. Because facial challenges entail an exacting burden that Plaintiffs cannot meet, their claim fails and must be dismissed.

A facial challenge to a statute's constitutionality is the "most difficult challenge to mount successfully." *United States v. Rahimi*, 602 U.S. 680, 708 (2024) (Gorsuch, J., concurring) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). To prevail on this sort of challenge, Plaintiffs must show "no set of circumstances" exist in which Minnesota's law can be applied without violating the Second Amendment. *Id.* Plaintiffs cannot meet this burden because there are, in fact, many circumstances in which Minnesota's law may be constitutionally applied. The facial nature of Plaintiffs' challenge thus dooms their claim.

Minnesota's shall-issue regime is constitutional because it is consistent with historical traditions of firearm regulation. *See Bruen*, 597 U.S. at 17; *id.* at 79-80 (Kavanaugh, J., concurring) (confirming states may employ "objective shall-issue licensing regimes" that include steps such as fingerprinting, a background check, and firearms training). In *Bruen*, the Supreme Court explicitly indicated that states employing shall-issue regimes "may continue to do so," *id.* at 80 (Kavanaugh, J., concurring), citing Minnesota as one such state, *id.* at 13 n.1 (citing Minn. Stat. § 624.17).

Minnesota constitutionally applies its permitting regime to thousands of individuals, certainly to residents of Minnesota, as well as individuals from states that qualify for reciprocity under Subdivision 16 and individuals from non-reciprocal states whose circumstances do not pose as many logistical challenges as Plaintiffs' do. Hawaii, for

instance, is a state that has permit reciprocity with Minnesota. *See* Minn. Dep't Pub. Safety, *Permit to Carry frequently asked questions* (last visited Feb. 10, 2025), https://perma.cc/G2BS-XYZK [hereinafter *DPS Reciprocity Website*]. Unlike Plaintiffs, therefore, any individual with a Hawaiian gun permit may lawfully carry a firearm in Minnesota without facing the alleged burdens Plaintiffs detail in the Complaint, (ECF 1 ¶¶ 66-74), the Reciprocity Provision notwithstanding. Minn. Stat. § 624.714, subd. 16(a). Absent these alleged burdens, the Reciprocity Provision would not (and could not) pose any constitutional question in the case of these individuals, meaning that this provision is constitutional in at least "some of its applications." *Rahimi*, 602 U.S. at 693.

Thus, even if Plaintiffs could establish a question about the constitutionality of Section 624.17 as applied to them (though they cannot), their claim nevertheless fails because they have not shown this law is unconstitutional as applied to everyone else. This conclusion alone is enough to end their lawsuit, because Article III precludes this Court from reconfiguring Plaintiffs' facial claim into something that it is not. *Id*. at 714 (Gorsuch, J., concurring) (explaining federal courts decide only the case or controversy before them).

The Supreme Court's decision in *United States v. Rahimi* illustrates this point well. In *Rahimi*, the plaintiff lodged a facial challenge to 18 U.S.C. § 922(g)(h), which criminalizes the possession of firearms by individuals subject to domestic-violence restraining orders. *Id.* at 684-86. The Court noted the facial nature of Mr. Rahimi's challenge to this statute when it rejected his challenge. *Id.* at 693. And in his concurring opinion, Justice Gorsuch explained why this aspect of the challenge was so important, emphasizing that the Court not only declined to reach the as-applied challenge Mr. Rahimi

9

might have made, but indeed *could not* have reached any such challenge: " . . . [T]he case before us does not pose the question whether the challenged statute is always lawfully applied, or whether other statutes might be permissible, but only whether this one has any lawful scope." *Id.* at 713 (Gorsuch, J., concurring) (citing U.S. Const. art. III). Thus, just as Article III prevented the Supreme Court from assessing whether Section 922(g)(h) might be unconstitutional as applied to Zackey Rahimi, so too does Article III prevent this Court from assessing whether Section 624.714 might be unconstitutional as applied to Plaintiffs. Minnesota's statute unquestionably has a lawful scope, so Plaintiffs' challenge fails.

For these reasons, the facial nature of Plaintiffs' claim also requires dismissal.

## II.   PLAINTIFFS' RECIPROCITY ARGUMENTS FAIL AT STEP ONE OF *BRUEN* AND ARE RED HERRINGS FOR THEIR ATTACK ON THE SUBSTANCE OF MINNESOTA'S PERMITTING REGIME.

The Court should reject Plaintiffs' reciprocity arguments for two reasons. First, these arguments fail at Step One of *Bruen*'s test for evaluating Second Amendment claims. Second, and more fundamentally, these arguments are ill-fitting. They ignore important issues such as the Tenth Amendment and federalism concerns, and they distract from the principal target of Plaintiffs' attack in this lawsuit: Minnesota's shall-issue permitting regime. Both reasons support dismissal.

Under *Bruen*'s first step, the Reciprocity Provision does not fall within the sweep of the Second Amendment for the simple reason that it regulates other states, not individuals. The Reciprocity Provision is Minnesota's method for understanding and monitoring the ways in which its sister states grant gun permits to applicants within their jurisdictions. Minnesota may, and has in the case of twenty states, extended reciprocity to

states that meet the requirements of Subdivision 16. (ECF 1 ¶ 21-24; *DPS Reciprocity Website*.) The plain text of this provision requires the Commissioner to curate a list "of other *states*" with permitting regimes that track Minnesota's, not other people with permits that are satisfactory to Minnesota. Minn. Stat. § 624.714, subd. 16(a) (emphasis added). But the Second Amendment only protects an individual right to bear arms. *See McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (citing *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)) (explaining *Heller* held that right to "individual" self defense is the Second Amendment's central component). Accordingly, because the Reciprocity Provision regulates states, it does not target any "individual's conduct" that the Second Amendment's plain text might protect.[2] *Bruen*, 597 U.S. at 24. Plaintiffs' challenge thus fails at Step One.

More broadly, Minnesota's decision to regulate firearms in the manner set forth by the Reciprocity Provision stems from its inherent police powers and role as a sovereign state within this nation. *See, e.g.*, U.S. Const. art. X. The United States has not set a federal ceiling on firearm-permitting regimes, and unless or until it does, the States retain the ability to regulate such matters consistent with the Constitution. *See United States v. Cruikshank*, 92 U.S. 542, 551 (1872) (explaining that rights not "granted or secured" by the federal government "are left to the exclusive protection of the States").

---

[2] A better challenge to the Reciprocity Provision might be one by the nonreciprocal states themselves, as the regulated entities. But states, of course, are not "part of 'the people' with a right to keep and bear arms," *Worth*, 108 F.4th at 688, so that challenge would also fail at Step One of *Bruen*.

11

This outcome is not only mandated by *Bruen*, it makes good sense. The Second Amendment right to keep and bear arms is not unlimited. *Bruen*, 597 U.S. at 20. States are thus entitled to enact reasonable regulations of this right, so long as any restrictions comport with historical traditions of firearm regulations. *Id.* at 17; *Heller*, 554 U.S. at 636 (confirming the Constitution "leaves [states] a variety of tools" for regulating problems associated with firearms). *Bruen*'s test thus sets a ceiling—a point of regulation beyond which infringements or burdens on Second Amendment rights become unconstitutional. *Id.* at 22 (discussing *Heller* and describing test as assessing "outer limits" of [the Second Amendment]). What *Bruen*'s test does not impose, however, is a floor. Thus, contemporary firearm regulations comply with the Second Amendment so long as they fit under *Bruen*'s ceiling, even when those regulations could be more permissive, or when they differ from the regulations of neighboring states.

Critically, this logic cuts both ways. Just as *Bruen* did not force Minnesota to the floor-level regimes of certain nonreciprocal states, neither does the Second Amendment yank other states—Georgia and Texas, for instance—up to the Constitution's regulatory ceiling. Take the Supreme Court's recent decision in *Rahimi*, for instance. The Supreme Court held that a government may constitutionally disarm individuals "who present a credible threat to the physical safety of others." 602 U.S. at 700. Some states may choose to enact regulations that disarm such individuals, but nothing about *Rahimi* requires each and every state to do so. Surely, Plaintiffs would agree the Second Amendment does not require Texas, Florida, and Georgia to match Minnesota's regulations on this issue. For the same reason, nothing about the Second Amendment requires Minnesota to align its

permitting regime with those of other states. All that matters under the Second Amendment is that each state's individual regime fits within the Constitution's ceiling, as defined by *Bruen*'s test. Minnesota's regime does.

In sum, *Bruen* and related Second Amendment jurisprudence allow for diverse regulatory regimes to coexist throughout the Nation. The Second Amendment "does not force" Minnesota or another other state "into a regulatory race to the bottom." *Culp v. Raoul*, 921 F.3d 646, 658 (7th Cir. 2019), *cert. denied*, 141 S. Ct. 109 (Mem.) (June 15, 2020). This Court should not, either.

### III. MINNESOTA'S SHALL-ISSUE PERMITTING REGIME IS CONSTITUTIONAL.

Plaintiffs' claim centers on the Reciprocity Subdivision, but many of their allegations address the substantive requirements of Minnesota's permitting regime. Accordingly, Commissioner Jacobson addresses these allegations out of an abundance of caution and to preserve the following arguments for reply and appeal.

#### A. Plaintiffs Have Not Alleged Any Infringement of Their Second Amendment Rights, So Their Challenge Fails at *Bruen*'s First Step.

Although framed as a reciprocity issue, Plaintiffs' claim is fundamentally a challenge to the terms of Minnesota's shall-issue permitting regime. Under *Bruen*, such regimes are presumptively constitutional. *Bruen*, 597 U.S. at 13 n.1, 17; *accord, e.g.*, *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 224-25 (4th Cir. 2024); *Conn. Citizens Def. League, Inc. v. Thody*, No. 23-724-cv, 2024 WL 177707, at *5-6 (2d Cir. Jan. 17, 2024); *cf. McRorey v. Garland*, 99 F.4th 831, 838-39 (5th Cir. 2024) (treating background checks in context of firearm purchases as presumptively-constitutional under *Bruen*). Challenges

to shall-issue regimes "can survive step one of the *Bruen* analysis only if [the plaintiffs] can demonstrate that the law 'infringes,' or effectively 'den[ies],' the Second Amendment right." *Moore*, 116 F.4th at 225. Indeed, Justice Kavanaugh's concurring opinion in *Bruen* suggests such regimes are so obviously-permissible that they may be challenged only on an as-applied basis if the regime "does not operate [as shall-issue] in practice." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.).

In their futile attempt to establish infringement, Plaintiffs make no allegation that Minnesota's permitting regime imposes any sort of "proper-cause" requirement like the one from New York's former permitting regime that the Supreme Court struck down in *Bruen*, *id*. at 70-71. (ECF 1.) Instead, Plaintiffs complain about several unremarkable aspects of Minnesota's gun-permitting regime: its in-person application requirement, $100 application fee, thirty-day processing period, and five-year renewal requirement. (*Id.* ¶¶ 67, 72.) None of these requirements constitutes infringement because Plaintiffs have not plausibly alleged any facts that suggest these component requirements have been applied to them in an unconstitutional manner.[3] *See Bruen*, 597 U.S. at 80; *compare, e.g.*, (ECF 1 ¶ 17-18, 67, 72 (alleging processing period of up to thirty days for gun permits in Minnesota as component of Second Amendment violation theory) *with Cal. Rifle & Pistol Ass'n, Inc.*

---

[3] Again, the Second Amendment challenge that Plaintiffs advance is facial and pertains to the Reciprocity Provision, not Minnesota's shall-issue permitting regime. (*See* Arg. § I.B, *supra*; ECF 1 ¶¶ 5, 88.) But because Plaintiffs make so many allegations about the alleged burdens of Minnesota's shall-issue regime, (ECF 1 ¶¶ 67-72), Commissioner Jacobson addresses these allegations pursuant to the framework set forth by the Supreme Court for such challenges, which must proceed on an as-applied basis. *Bruen*, 597 U.S. at 80.

14

*v. Los Angeles Cnty. Sheriff's Dep't*, __ F. Supp. 3d __, 2024 WL 4875390, at *8 (C.D. Cal. Aug. 20, 2024) (noting record evidence, on motion for preliminary injunction, of processing delays over eighteen months for gun permits in California in Second Amendment challenge based on length of permitting process). Absent such allegations, these requirements of Minnesota's permitting regime are simply the means by which Minnesota ensures permits are only issued to responsible, law-abiding citizens—a limitation on permits that is completely consistent with *Bruen*.[4]

But even if Plaintiffs had made such allegations, these requirements nevertheless survive Step Two of *Bruen* as they comport with the Nation's historical tradition of ensuring that only responsible, law-abiding individuals carry firearms.

### B.   Minnesota's Permitting Regime Comports with History and Tradition.

Even if the Court proceeds to *Bruen*'s second step, though it need not, the component requirements of Minnesota's permitting regime are consistent with historical traditions of firearm regulation and, therefore, constitutionally permissible.

Each of the requirements Plaintiffs challenge facilitate Minnesota's prerogative and obligation to ensure firearm permits are only issued to responsible, law-abiding individuals. For example, Minnesota is entitled to require applicants to appear in person with their

---

[4] Plaintiffs have not alleged any Second Amendment right to keep and bear arms without paying basic regulatory fees for the "direct cost," Minn. Stat. § 624.714, subd. 3(f), of regulating a right that "is not unlimited." *Bruen*, 597 U.S. at 21. By failing to address *Bruen*'s framework for this aspect of their challenge, Plaintiffs "have provided no basis to grant their request" for relief. *Cal. Rifle & Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't*, __ F. Supp. 3d __, 2024 WL 4875390, at *15 (C.D. Cal. Aug. 20, 2024). For this reason, the Court need not even reach Step One of *Bruen* as to the fee requirement.

application, training certification, and identification so the sheriff can conduct the background check mandated by statute. *See* Minn. Stat. § 624.714, subds. 3(e), 4(a). Minnesota is also entitled to some minimal amount of time to process an individual's application documents and conduct any necessary investigation, *id.* subds. 4(a), 6(a); an opportunity once every five years to confirm a permitted individual is still responsible and law-abiding, and competent to safely handle a firearm as evidenced by proof of current training, *id.* subd. 7(c) (explaining renewal uses "the same criteria" under which original permit was obtained); and recovery of the "direct costs" associated with these tasks, *id.* subd. 3(f). "By equating 'infringement' with any temporary delay," Plaintiffs ignore the Supreme Court's guidance that requirements such as background checks, "which necessarily occasion some delay, ordinarily will pass constitutional muster without requiring the government to justify the regulation at step two." *Md. Shall Issue*, 116 F.4th at 227 (citing *Bruen*, 597 U.S. at 38 n.9); *accord McRorey*, 99 F.4th at 838 ("Our law is plain as can be that some amount of time for background checks is permissible.").

The Supreme Court itself has painstakingly canvassed the historical record, amassing a collection of Founding-Era sources that support the principle of ensuring firearms are handled only by responsible, law-abiding citizens. *See Rahimi*, 602 U.S. at 692 (emphasizing that historical sources need only establish a match in principle with the contemporary regulation at issue, and need not be identical). In *Rahimi*, for example, the Court looked as far back as 13th- and 14th-century England and noted firearm regulations that sought to prevent the misuse of weapons to harm others. *Id.* at 693-94. By the 18th and

19th centuries, the Court noted, the legal regime of surety laws had emerged. *Id.* at 697; *see also Bruen*, 597 U.S. at 55 (discussing surety laws in context of proper-cause laws).

Particularly relevant here, the Court described surety laws as a "mechanism for preventing violence before it occurred." *Rahimi*, 602 U.S. at 697. Preventing violence before it occurs is exactly what Minnesota seeks to do through its gun-permitting regime. The component requirements of the regime, such as in-person applications and periodic renewals, are the logistical grist that makes this regime effective in practice. For these reasons, the historical analogue of surety laws is a sufficient example (though not the only one) for this Court to conclude that Minnesota's gun-permitting regime and its component requirements fit comfortably within historical traditions of firearm regulation. Minnesota's regime thus passes the Second Step of *Bruen* and is, therefore, constitutional under the Second Amendment. Accordingly, Plaintiffs' claim fails and should be dismissed.

***

Nothing about Minnesota's gun-permitting regime infringes Plaintiffs' rights, and certainly not to a degree of constitutional import. To the extent Plaintiffs rest on their unique status as individuals who pass in and out of Minnesota as the reason why these permitting regulations allegedly cannot work for them, this argument begs the question: if Plaintiffs are never in Minnesota long enough to apply for a gun permit, are they ever in Minnesota long enough to need one? It seems not.

## CONCLUSION

For all of the foregoing reasons, Commissioner Jacobson respectfully requests that the Court grant his motion and dismiss Plaintiffs' claim in full and with prejudice.

Dated: <u>February 18, 2025</u>   Respectfully submitted,

                                             KEITH ELLISON
                                             Attorney General
                                             State of Minnesota

                                             <u>s/ Madeleine DeMeules</u>
                                             AMANDA PRUTZMAN (#0389267)
                                             MADELEINE DEMEULES (#0402648)
                                             Assistant Attorneys General

                                             445 Minnesota Street, Suite 1400
                                             St. Paul, Minnesota 55101-2131
                                             (651) 300-6807 (Voice)
                                             (651) 282-5832 (Fax)
                                             Madeleine.DeMeules@ag.state.mn.us

                                             ATTORNEYS FOR DEFENDANT

|#5993755-v1