UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| David A. McCoy II, Jeffrey M. Johnson, Sr., | Case No. 25-cv-00054 (JRT/DTS) |
| Plaintiffs, | |
| vs. | COMMISSIONER JACOBSON'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS |
| Bob Jacobson, in his official capacity as the Commissioner of the Minnesota Department of Public Safety, | |
| Defendant. | |

The Commissioner moved for dismissal for failure to state a claim. Plaintiffs' response fails to rebut any of the Commissioner's independently-sufficient arguments in favor of dismissal. For the reasons set forth below, dismissal is proper.

## ARGUMENT

On Reply, the Commissioner addresses four issues. First, Plaintiffs lack standing. Second, Plaintiffs' claim is facial, not as-applied. Third, Plaintiffs' claim does not even trigger Step One of the *Bruen* analysis. And fourth, even if *Bruen* applies (though it does not), the Commissioner has carried his burden at Step Two of *Bruen*.

### I.   PLAINTIFFS LACK STANDING.

The Commissioner argued that Plaintiffs lack standing to advance their claim. (ECF 15, at 5-7.) The parties primarily disagree on the injury requirement. Plaintiffs argue that the Commissioner's argument holds them to an improperly high burden of persuasion by misapplying *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). (ECF 19, at 7, 9-12). But the opposite is true: Plaintiffs fail to acknowledge the full scope of their burden to

establish standing. Their argument also misapprehends *Lujan*, and ignores the cases that fix the standard Plaintiffs must satisfy at the pleading stage. In their response, Plaintiffs identify three aspects of their pleadings that, they assert, establish an injury sufficient to confer standing. The Commissioner addresses each of these in turn

    **A.**    **The Complaint's Allegations Regarding Travel to Minnesota Do Not Clear the Plausibility Bar.**

First, Plaintiffs argue that they adequately alleged future travel to Minnesota that will subject them to Minnesota's gun laws. (*Id.* at 7.) To support this argument, Plaintiffs cite to the following four allegations in their 88-paragraph complaint:

- "[Plaintiff McCoy] travels on the road delivering goods throughout the 48 contiguous states at least 300 days a year, including several trips each year to and through Minnesota."

- "[Plaintiff McCoy] travels through Minnesota several times a year."

- "[Plaintiff Johnson] travels on the road delivering goods throughout the 48 contiguous states at least 300 days a year, including several trips each year to and through Minnesota."

- "[Plaintiff Johnson] travels through Minnesota several times a year."

(*Id.* at 7 (citing ECF 1 ¶¶ 25, 33, 42, 54).) According to Plaintiffs, these allegations give rise to "a reasonable inference" that Plaintiffs "did in fact travel to Minnesota several times last year and will again travel to Minnesota several times this year." *Id.*

For a court to draw "reasonable inferences" from a plaintiff's complaint, the allegations must include "sufficient factual matter" from which reasonable inferences can

be drawn. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining whether pleadings contain sufficient factual allegations "is context specific" and requires courts to use "experience and common sense." *Id.* A complaint does not clear plausibility's hurdle "if it tenders a "naked assertion" without "further factual enhancement." *Twombly v. Bell Atl. Corp.*, 550 U.S. 544, 557 (2007).

The allegations here lack sufficient factual matter from which the Court can draw the reasonable inferences on which Plaintiffs rely. Had Plaintiffs alleged, for example, how frequently they traveled to Minnesota in the past, or whether their work corresponds to particular routes or regions of the country, the Court could use experience and common sense to assess the likelihood that they will be required return to Minnesota in the future.

Instead, the Court is left with the "naked assertion" that Plaintiffs will travel to Minnesota again simply because their work occurs within the continental United States. *Twombly*, 550 U.S. at 557. Applying "common sense" to this allegation, the mere fact that a truck driver could be assigned to drive anywhere throughout the country does not make it plausible that the driver will be assigned to pass through a specific state.

On a state-by-state level, for example, Minnesota is just one of forty-eight states in the continental United States. Without factual matter to establish certain states as more- or less-likely destinations than others, the most reasonable inference to draw from Plaintiffs' allegation is that they have a 2.1% chance of being assigned to Minnesota on any given day. Or, consider the allegations in terms of interstate miles across the country. *See Iqbal*, 556 U.S. at 678 (noting that evaluation of a complaint's allegations is "context specific"). As of December 31, 2024, the continental United States had 48,029.76 net miles of

3

interstate highway, 912.73 of which run through Minnesota.[1] Again, without any factual allegations about the routes to which Plaintiffs have been assigned in the past or might be in the future, the reasonable inference that flows from their allegation is that Plaintiffs have a 1.9% chance of being assigned to an interstate route through Minnesota on any one day.

These examples demonstrate why Plaintiffs' allegations fall short of the plausibility bar set forth in *Twombly* and *Iqbal*. In *Twombly*, the Supreme Court rejected a claim that telecommunications providers had conspired to fix industry prices. 550 U.S. at 564-65. Those plaintiffs argued that they had sufficiently pleaded the necessary illegal agreement by alleging "parallel conduct" and anticompetitive markets. *Id.* The Court concluded that these allegations were insufficient because the alleged parallel conduct was equally susceptible to "an obvious alternative explanation." *Id.* at 567.

And in *Iqbal*, the Supreme Court rejected a complaint that federal officials discriminated against a detainee by purposefully classifying him as "high interest," based on protected characteristics. 556 U.S. at 681. Plaintiff attempted to plead a claim for discrimination by alleging that federal officials acted "solely on account of [his] religion, race, and/or national origin." *Id.* at 680 (alteration original). The Court concluded that these allegations were insufficient because they did not plausibly suggest that the federal officials acted with a discriminatory state of mind, as opposed to the equally-likely but legal motive of national security. *Id.* at 682-83. Without reference to "factual context," the Court found the plaintiff's allegations to be "conclusory statements" that it could not credit. *Id.* at 686.

---

[1] *See* Fed. Highway Admin., U.S. Dep't Trans., *FHWA Route Log and Finder List, Table 3: Interstate Routes* (last updated Feb. 18, 2025), https://perma.cc/UF6H-A948.

The same reasoning applies here, but with added force. It is possible that someone who can be assigned to work anywhere in the continental United States will be assigned to work in Minnesota. But it is also possible—and indeed, more likely—that this person could also be assigned to one of the other forty-seven contiguous states. Plaintiffs' allegations thus establish nothing more than "a sheer possibility" of assignments that would take them to Minnesota. *Id.* at 678. Because this showing fails to "nudge[] their claim" of a Minnesota work assignment "across the line from conceivable to plausible," the complaint must be dismissed. *Twombly*, 550 U.S. at 570.

### B. Plaintiffs Fail to Allege Injuries from Time and Money Spent Applying for Permits.

Second, Plaintiffs argue that the "temporal" and "financial" barriers to obtaining a gun permit constitute an injury sufficient to confer standing. (ECF 19, at 8.) This argument defies logic and Supreme Court precedent.

The Supreme Court's decision in *Bruen* "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. . . . In particular, the Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 79 (2022). Minnesota is a "shall-issue" licensing state. *See id*, 597 U.S. at 13, n.1. As the Fourth Circuit has explained, permitting laws that impose modest administrative requirements before an individual may carry a firearm "ordinarily will pass constitutional muster without requiring the government to justify the regulation." *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 227 (4th Cir. 2024), *cert. denied*, 2025 WL 76446, at *1 (U.S. Jan. 13, 2025) (citing *Bruen*,

597 U.S. at 38 n.9). Temporary delay and routine administrative requirements do not equate to constitutional infringement as a matter of law. *Id.*; *see also Bruen*, 597 U.S. at 38 n.9 ("Our law is plain as can be that some amount of time for background checks is permissible.").

The same is true even for individuals like Plaintiffs, who allege that these burdens are enhanced for them because they are not Minnesota residents. A recent opinion of the Massachusetts Supreme Judicial Court shows why even Plaintiffs' unique situation does not yield any unconstitutional burden. *See Commonwealth v. Marquis*, __ N.E.3d __, 2025 WL 5456574 (Mass. 2025). Acknowledging that the Massachusetts law at issue placed an "ex ante condition on the right to carry," the court explained that such conditions are necessary and acceptable consequences of "<u>any</u> licensing scheme." *Id.* at *14 (emphasis original); *accord, e.g.*, *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) (explaining that shall-issue licensing regimes do not give rise to Second Amendment issues so long those regimes are not applied in practice to frustrate protected rights).

Like Plaintiffs here, the defendant in *Marquis* took issue with the permit processing time, alleging it curtailed his right to carry. 2025 WL 5456574, at *15. While noting that some amount of delay is inherent in any permitting process, the court found the defendant pointed to "no evidence that the Commonwealth's processing times meaningfully hinder the ability of nonresidents to exercise their right to public carry in all circumstances, let alone that the processing timeline is so burdensome that it rises to the level of a constitutional violation." *Id*.

Plaintiffs have not made any allegation, plausible or otherwise, that Minnesota's permitting requirements are applied in practice to frustrate their rights. Minnesota is not an outlier in requiring in-person applications, nor in charging modest application fees. *See, e.g.*, Mich. Comp. Laws § 28-245b(1) (in-person application), (5) ($100 fee); 430 Ill. Comp. Stat. § 66/10(a)(3) (requiring fee). In any event, the Reciprocity Provision offers Plaintiffs twenty alternative licensing schemes if Minnesota's is not to their liking. *See* Minn. Dep't Pub. Safety, *Permit to Carry frequently asked questions* (last visited Feb. 10, 2025), https://perma.cc/G2BS-XYZK. Many of these alternatives solve the problems Plaintiffs attempt to conjure here. *See, e.g.* 2022 S.D. Sess. Laws ch. 70 (making South Dakota permits free); Ky. Rev. Stat. § 237.110 subd. 7(a)(2) (electronic application).

### C. Plaintiffs, Not the Commissioner, Misapprehend *Lujan*.

Third and finally, Plaintiffs' challenge the Commissioner's reliance on *Lujan*. (ECF 19, at 11-12.) This argument misapprehends the Commissioner's position and, more importantly, misapplies *Lujan* in light of subsequent Supreme Court precedent.

The Commissioner relied on *Lujan* to illustrate what a plaintiff must plead when relying on allegations of future travel to establish injury. (ECF 15, at 5-7.) The Commissioner consistently spoke of the "allegations" Plaintiffs failed to provide, not facts they failed to prove. *Id.* Holding Plaintiffs to their burden of alleging plausible claims does not impose the premature summary judgment burden Plaintiffs reference in their briefing, (ECF 19, at 11-12), because all the omissions the Commissioner identified are failures of pleading, not of proof.

7

In fact, it is Plaintiffs, not the Commissioner, who misapply *Lujan*. They cite *Lujan* for the proposition that "general factual allegations of injury" suffice at the pleading stage, because motions to dismiss require courts to presume "that general allegations embrace those specific facts that are necessary to support the claim.'" (*Id.* (citing *Lujan*.) Because Plaintiffs made general allegations about traveling to Minnesota, they argue, this Court should presume the specific facts necessary to support those allegations by way of "reasonable inferences" in Plaintiffs' favor. (*Id.* 10.)

But *Lujan* predates *Twombly* and *Iqbal*. The latter two decisions fundamentally changed the federal pleading standard and the manner in which courts evaluate the legal sufficiency of allegations in a complaint. Litigants can no longer advance general or conclusory statements, unsupported by "sufficient factual matter," and leave a court to connect the dots that might show a claim is plausible. *Iqbal*, 556 U.S. at 678. Here, however, Plaintiffs do just that. They argue that the Court should infer it is not only possible, but plausible, that Plaintiffs will travel to Minnesota simply because they alleged a history of travel throughout the continental United States. This allegation, without more, "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

At bottom, Plaintiffs' attempt to leverage *Lujan* only underscores their misapprehension of the applicable pleading standard in this case and their failure to meet the same.

*\*\*\**

In light of the foregoing reasons, Plaintiffs' rejoinders to the Commissioner's standing argument fail. Because Plaintiffs lack standing, their claim should be dismissed.

8

## II.    THE RELIEF PLAINTIFFS SEEK CONFIRMS THAT THEIR CLAIM IS FACIAL.

The Commissioner views Plaintiffs' claim as a facial challenge. (ECF 15, at 7-10.) Plaintiffs respond that the complaint uses the term "as-applied," arguing that the Court should conclude they advanced both a facial and as-applied challenge. (ECF 19, at 21.) The Commissioner disagrees and maintains that Plaintiffs' sole claim is facial.[2]

When determining whether a challenge is facial or as-applied, labels do not matter. *John Doe No. 1. v. Reed*, 561 U.S. 186, 194 (2010). Rather, the distinction between facial and as-applied challenges turns on the remedy sought. *See Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 331 (2010). When the relief sought reaches "beyond the particular circumstances of [the] plaintiffs," the underlying challenge is properly categorized as facial. *Reed*, 561 U.S. at 194. Requests to declare a law unconstitutional in all applications necessarily reach beyond the particular circumstances of any plaintiff. *Id.* Conversely, if the relief requested would render a statute inapplicable to the challenger, but leave the law otherwise unenforceable, the underlying challenge is as-applied. *Repub. Party of Minn. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004).

Here, Plaintiffs advanced a single claim. In their prayer for relief, Plaintiffs make three relevant requests:

- A judgment declaring that Minnesota's laws, practices, policies, and customs of refusing to recognize the lawfully issued out-of-state firearm permits violates the Second Amendment;

---

[2] Even if the Court concludes Plaintiffs advanced an as-applied claim, that claim would still fail on the merits. Plaintiffs' claim does not trigger Step One of *Bruen*, but even if it did, the Commissioner has identified sufficient historical authority to prevail at Step Two.

9

- An order declaring that Defendant must recognize and honor lawfully issued firearm permits issued from all other states, regardless of whether the permit holder is a resident of Minnesota;

- A permanent injunction prohibiting Defendant from enforcing all laws prohibiting the carrying of a firearm without a Minnesota PTC or recognized out-of-state firearm permit if the person accused of that crime has an otherwise-valid permit to carry issued by any state; and is not otherwise prohibited from possessing or carrying firearms.

(ECF 1, at 23 ¶¶ A-C.)

None of these broad requests are limited in scope to Plaintiffs, or even to their home states of Texas and Florida. Instead, these requests seek relief for "millions of other similarly situated Americans" who hold permits from "all other states." (*Id.* 20 ¶ 74; 23 ¶ B.) This relief would render the Reciprocity Provision totally unenforceable in any circumstance. *See Klobuchar*, 381 F.3d at 790. And, this relief would eclipse Plaintiffs and the circumstances they present here. *Reed*, 561 U.S. at 194. Due to the scope of the relief that Plaintiffs request, their claim is properly categorized as facial.

Because their claim is facial, the Court must hold Plaintiffs to the heavy burden such claims impose. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Plaintiffs attempt to foist this burden onto the Commissioner, relying on *Rahimi*'s discussion about the government's burden at *Bruen*'s second step. (ECF 19, at 22.) That argument misapplies *Rahimi*. There, neither party disputed that *Bruen*'s first step was satisfied. *United States v. Rahimi*, 602 U.S. 680, 708 (2024) (Gorsuch, J., concurring). But here, the Commissioner strongly disputes that issue. Plaintiffs cannot meet that high bar for the reasons set forth in the Commissioner's principal brief and this reply.

Accordingly, Plaintiffs' facial claim fails as a matter of law and must be dismissed.

10

### III. PLAINTIFFS' CLAIM DOES NOT EVEN TRIGGER STEP ONE OF *BRUEN*.

As the Commissioner argued in his principal brief, Plaintiffs' claim about the Reciprocity Provision is really just an improper attack on Minnesota's sovereign right to regulate guns within its borders. (ECF 15, at 11.) At least one federal district judge has concluded that such challenges are facially dismissible. *See, e.g.*, *Meissner*, No. 23 Civ. 1907 (NEB), 2025 WL 712744, at *4 (S.D.N.Y. Mar. 5, 2025) (citing *U.S. v. Libertad*, 681 F. Supp. 3d 102, 111 (S.D.N.Y. 2023)) (noting properly-applied shall-issue regimes "do not even trigger" a *Bruen* analysis). Absent any allegations that Minnesota's shall-issue regime has been improperly applied, Plaintiffs' challenge to the same fails at Step One of *Bruen*.).

Plaintiffs appear to concede that they challenge Minnesota's permit requirement, not the Reciprocity Provision: "Plaintiffs do not argue that Minnesota must match other states in its regulations, but rather that [its] method of firearm regulation . . . is unconstitutional itself." (ECF 19, at 17.) Therefore, the Court's Step One analysis of the Reciprocity Provision can end here. Their apparent concession notwithstanding, Plaintiffs nevertheless argue that the Reciprocity Provision triggers a *Bruen* analysis. The Commissioner thus replies to this argument.

Fundamentally, Plaintiffs are upset that Minnesota law requires them to get a permit before they can carry guns in Minnesota. They argue that the Reciprocity Permit is the source of their troubles, asserting that this provision "plainly regulates individual conduct" by preventing the holder of a non-reciprocal permit "from engaging in the constitutionally protected activity of carrying a firearm for lawful purpose." (*Id.* 15.)

11

This argument misapprehends the Reciprocity Provision and relevant law. Minnesota's permit requirement does not stem from the Reciprocity Provision. A different law, Minn. Stat. § 624.714, gives rise to Minnesota's requirement that people who carry guns must get a permit first. Plaintiffs are thus wrong to focus on the Reciprocity Provision.

As stated in the Commissioner's principal brief, this provision governs states and permitting regimes, not individuals. (ECF 15, at 10-11.) Its clarification that non-reciprocal permits are insufficient, as Plaintiffs argue, makes no difference. (ECF 19, at 14-15.) This textual aside is inapposite because the Reciprocity Provision does not prevent people with non-reciprocal permits from obtaining an acceptable permit, either in Minnesota or a reciprocal state. The Reciprocity Provision thus allows individuals with non-reciprocal permits to carry firearms for a lawful purpose. Those individuals simply must obtain a proper permit first—just like everyone else who wants to carry a firearm in Minnesota.

The Massachusetts Supreme Judicial Court recently confronted a similar challenge to a law regulating non-resident permit requirements in *Marquis*. That court rejected the plaintiff's framing of the non-resident permit requirement for making the same mistakes that Plaintiffs make here. Rather than unfairly burdening nonresidents, the court explained, the law "applies the same substantive requirements to residents as to nonresidents. Both must obtain a license in order to possess a firearm." 2025 WL 5456574, at *14.

So too here. Removing the Reciprocity Provision from the equation demonstrates the logical flaw in Plaintiffs' argument. Minnesota could have chosen not to extend reciprocity to any other states. In that scenario, Plaintiffs would still need a permit to carry in Minnesota, and they would still be unable to use their Texas and Florida permits to do

12

so. *See* Minn. Stat. § 624.714. Plaintiffs are thus incorrect to blame the Reciprocity Provision for their alleged injuries.

Indeed, the Reciprocity Provision makes it easier to exercise one's Second Amendment rights in Minnesota, because this provision offers twenty alternatives to Minnesota's permitting regime. For example, people who want to pay less for a permit than Minnesota charges—$100—may obtain a permit from a reciprocal state such as South Dakota, where permits are free. *See* 2022 S.D. Sess. Laws ch. 70 (South Dakota); *see also* Idaho Code § 18-3302(15) ($20); Mont. Code § 45-8-322(3) ($50). And, people who do not want to (or cannot) complete an in-person appointment could apply for a permit from reciprocal states like Kentucky or New Mexico, where applicants may apply online or via mail. Ky. Rev. Stat. § 237.110 subd. 7(a)(2) (electronic application); N.M. Code R. § 10.8.2.11(A) (allowing applications via mail).

These examples showcase that the spectrum of reciprocal permitting regimes address Plaintiffs' stated concerns. Plaintiffs may take full advantage of these regimes if they wish; nothing about the Reciprocity Provision prevents them from doing so. Ultimately, the Reciprocity Provision expands Plaintiffs' options for obtaining an acceptable permit. A law that makes it easier to exercise one's rights cannot burden those same rights, let alone unconstitutionally.

For these reasons, Plaintiffs' claim fails as a matter of law at Step One of *Bruen* and should be dismissed.

## IV. ALTERNATIVELY, MINNESOTA'S LAWS ARE JUSTIFIED BY HISTORICAL TRADITIONS OF FIREARM REGULATION AT STEP TWO OF *BRUEN*.

Plaintiffs' legally-deficient claim does not justify reaching *Bruen*'s second step. But even if the Court conducts this analysis, the Commissioner is correct that Minnesota's permitting regime passes its history-focused test.

The Commissioner argued that Minnesota's permitting regime passes *Bruen*'s second step because it comports with historical traditions of firearm regulation. (ECF 15, at 15-17.) Specifically, this regime ensures that only responsible, law-abiding individuals handle firearms—not dangerous individuals or people prone to violence. *Id.* Plaintiffs misapprehend this argument, as well as the historical analogues that justify Minnesota's permitting regime. (ECF 19, at 21.)

The Commissioner argued that Minnesota's permitting regime is consistent with historical traditions of firearm regulation. (ECF 15, at 15-17.) The Reciprocity Provision is irrelevant to this argument because it does not regulate protected Second Amendment conduct. Plaintiffs are thus incorrect that *Bruen*'s application to this case requires the Commissioner to comb historical firearm regulations about topics such as interstate travel and state-residency qualifications. (ECF 19, at 19.) If, for instance, the Reciprocity Provision prohibited residents of Florida and Texas from carrying firearms in Minnesota, such history might be relevant. But the Reciprocity Provision does not contain any such prohibition. This provision is thus irrelevant to the *Bruen* analysis at issue in this case, as are Plaintiffs' proposed topics of historical inquiry.

14

The Commissioner is also correct that the well-known historical laws discussed in *Bruen* and *Rahimi* are proper analogues for analyzing Minnesota's permitting regime. (ECF 15, at 15-17.) To satisfy *Bruen*'s second step, "historical twins" are not needed. *Bruen*, 597 U.S. at 30. All the government must identify are examples that demonstrate sufficient fidelity to history in a challenged statute's "why" and "how." *Id*. at 29.

Start with the "why" of Minnesota's permitting regime, which seeks to prevent gun violence before it occurs. (ECF 15, at 17.) Minnesota accomplishes this goal by limiting guns to responsible, law-abiding individuals, thereby keeping guns away from people who pose a risk of violence to others. *Id.* "If there is any point of consensus about what purposes have historically been recognized as a permissible basis for regulating access to firearms, it is 'what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed.'" *Marquis*, 2025 WL 5456574, at *12 (citing *Rahimi*, 602 U.S. at 698).

Employing this reasoning, the Supreme Judicial Court of Massachusetts recently upheld its shall-issue permitting scheme against a Second Amendment challenge. *See id.* at *11-15. Like Minnesota's permitting regime, the Massachusetts law is a shall-issue regime that entitles residents and nonresidents alike to obtain gun permits when specific statutory criteria are met. *See id.* at *11. The Supreme Judicial Court explained that these criteria provide "credible, individualized evidence that [an applicant] would pose a danger if armed." *Id*. at *12. This evidence, in turn, justifies the law as "consistent with 'the Nation's historical tradition of firearm regulation." *Id.* (citing *Bruen*, 597 U.S. at 24).

15

*Marquis* also addressed the "how" of the Massachusetts law. Its analysis is on all fours with this case. Like Minnesota's permitting regime, the Massachusetts law is a shall-issue regime. *Id.* at *13-14. Contrary to Plaintiffs' argument, (ECF 19, at 17-18), *Marquis* cites *Bruen* to describe shall-issue regimes as "presumptively constitutional," 2025 WL 5456547, at *13. This reasoning closely tracks the Commissioner's argument in his principal brief. (ECF 15, at 13-15.)

*Marquis* reached the same conclusion as the Commissioner on the issue of appropriate historical analogues. Contrary to Plaintiffs' argument, (ECF 19, at 20-21), *Marquis* treats surety and going-armed laws as acceptable historical analogues for "firearm regulations motivated by safety considerations," 2025 WL 5456547, at *13. Although these laws "did not employ the specific mechanism of licensure, they employed the more general mechanism of administratively conditioning firearm access by persons for whom individualized evidence of risk was found." *Id.* Under *Rahimi*'s rule that a law need only "comport with the principles underlying the Second Amendment," rather than supply a "historical twin," these Founding-era examples more than justify the form of Minnesota's shall-issue permitting regime. 602 U.S. at 692.

Minnesota's permitting regime is consistent with historical traditions of firearm regulation and, therefore, passes constitutional muster at *Bruen*'s second step. For these reasons, Plaintiffs' claim fails and should be dismissed.

## CONCLUSION

The Commissioner respectfully requests that the Court grant his motion and dismiss Plaintiffs' claim in full and with prejudice.

Dated:  <u>March 25, 2025</u>                   Respectfully submitted,

                                              KEITH ELLISON
                                              Attorney General
                                              State of Minnesota

                                              <u>s/ Madeleine DeMeules</u>
                                              AMANDA PRUTZMAN (#0389267)
                                              MADELEINE DEMEULES (#0402648)
                                              Assistant Attorneys General

                                              445 Minnesota Street, Suite 1400
                                              St. Paul, Minnesota 55101-2131
                                              (651) 300-6807 (Voice)
                                              (651) 282-5832 (Fax)
                                              Madeleine.DeMeules@ag.state.mn.us

                                              ATTORNEYS FOR DEFENDANT

|#6035236-v1